258 So.2d 694 (1972)
Maurice L. DEVILLE, Plaintiff-Appellee,
v.
UNITED STATES FIDELITY AND GUARANTY COMPANY et al., Defendants-Appellants.
No. 3734.
Court of Appeal of Louisiana, Third Circuit.
March 2, 1972.
*695 Stafford, Pitts & Bolen by John L. Pitts, Alexandria, for defendant-appellant.
Gist, Methvin & Trimble by James T. Trimble, Jr., Alexandria, for defendant-appellee-appellant.
Neblett, Fuhrer and Hunter by Leonard Fuhrer, Alexandria, for plaintiff-appellee.
Ford & Nugent by Howard N. Nugent, Jr., Alexandria, for defendant-appellee.
Before CULPEPPER, MILLER and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
Plaintiff, having been injured in an automobile accident, filed suit against Horace W. Rand, John C. Defee, Southern Chevrolet Company, Inc., Hartford Accident and Indemnity Company and United States Fidelity and Guaranty Company.
The facts show that on the morning of August 2, 1969 Horace W. Rand was the owner of an automobile which he had taken to Southern Chevrolet for service involving periodic routine maintenance. Southern Chevrolet habitually afforded its customers the convenience of picking up and delivering the automobiles to be serviced, and at the time employed John C. Defee, among others, for that purpose. Hartford was the liability insurer of the Rand automobile and Fidelity was the liability insurer of Southern Chevrolet.
Rand was driven to his office, in his automobile, by Defee. The latter was on his way back to the place of business of Southern Chevrolet, driving the Rand vehicle, when he came to a red semaphore light at which plaintiff was sitting in his stopped automobile. For some reason he failed to stop behind plaintiff's automobile, but instead struck its rear with the front end of the Rand automobile. Plaintiff alleges that he sustained injuries to his cervical spine as a result of the rear end collision.
Prior to trial Horace W. Rand was dismissed from the suit by a summary judgment *696 in his favor. Hartford filed a third party demand, in the alternative, against Fidelity, asking that if liability on its part should be found to exist, it be considered an insured of Fidelity and entitled to reimbursement from it for any sums paid out, as well as attorney's fees and other expenses incurred.
Following a trial on the merits judgment was rendered in favor of plaintiff and against Southern Chevrolet, Defee, and Fidelity jointly, severally and in solido in the amount of $25,581.15. Hartford was let out under an exclusion in its policy which denied coverage in the circumstances presented. The judgment was appealed by those defendants cast as well as by Hartford, the latter seeking to protect its third party demand in the event that coverage on its part should be found by this court. Plaintiff answered the appeals seeking an increase in the damages awarded him.
The liability vel non of Defee and Southern Chevrolet is not disputed, nor is there any serious denial of coverage on the part of Fidelity under the garage policy that it issued to Southern Chevrolet. The evidence is clear that the picking up and delivering of automobiles serviced by Southern Chevrolet was part and parcel of its "garage operations". It in fact had from two to four employees whose sole duty was to pick up and deliver customer's vehicles for service purposes, and a dispatcher who spent 90 per cent of his time attending to that operation. Accordingly the sole issues herein treated are those of insurance coverage on the part of Hartford and quantum.
The Hartford policy was determined not to afford coverage under an exclusionary clause therein contained which provides as follows:
"5. Exclusions: This policy does not apply under Section 1: ....
(g) to an owned automobile while used by any person while such person is employed or otherwise engaged in the automobile business, but this exclusion does not apply to the named insured, a resident of the same household as the named insured, a partnership in which the named insured or such resident is a partner, or any partner, agent or employee of the named insured, such resident or partnership;"
Under the heading "Definitions" in Section I of the policy we find, inter alia, the following:
"`automobile business' means the business or occupation of selling, repairing, servicing, storing or parking automobiles;"
In asserting that the exclusionary clause above quoted does not encompass the circumstances of this case, Fidelity cites two cases, Wilks v. Allstate Insurance Company, La.App., 177 So.2d 790, writ refused, 248 La. 424, 179 So.2d 18; and Dumas v. Hartford Accident & Indemnity Company, La. App., 181 So.2d 841. Both cases held that under facts similar to those in the case at bar, exclusionary clauses of the type before us were ineffective.
The clause in the Wilks case was substantially different from the instant one. Therein the policy stated that it did not apply to, "... an owned automobile while used in the automobile business,.." The key word was "used", and this court indicated that in a fact situation nearly identical to the one before us the automobile was not being "used in the automobile business" and, concluding that the clause was at least ambiguous, denied the defendant insurer a summary judgment dismissing it from the suit.
The clause found in the instant policy was apparently designed to replace the clause of the Wilks case and to be a clear statement of the intentions of the parties to the insurance contract. We think that purpose was achieved and find no ambiguity in the present clause.
Our esteemed brothers of the Court of Appeal of Louisiana, Second Circuit, opined *697 otherwise in Dumas v. Hartford Accident & Indemnity Company, supra. Presented with a clause identical to the one now under consideration, and a fact situation differing from ours only in that the automobile therein had already been serviced and was on its way back to the owner, they concluded that the exclusion did not apply and "... out of an abundance of precaution..." that the exclusionary clause was at least ambiguous.
The decision in Dumas was based on the court's determination that the work on the insured vehicle had been completed and that therefore the service station attendant who was driving it back to its owner's residence was not "employed or otherwise engaged in the automobile business." Although the trial judge and counsel for Hartford have made valiant attempts to distinguish the Dumas case, we think it unnecessary to do so since we opine, as the trial judge evidently ended up doing, that the Dumas opinion is in error.
The exclusionary clause is clear and completely devoid of ambiguity. There is no liability coverage of the owned automobile while being used by any person while such person is employed or otherwise engaged in the automobile business. Surely an employee of the servicing concern, in our case Southern Chevrolet, is employed in the automobile business. The evidence adduced at trial leaves no doubt but that the pick up and delivery of vehicles to be serviced is a routine and significant portion of the activities of Southern Chevrolet. The conclusion is therefore inescapable that when the employee of Southern Chevrolet, whose only duties consist of picking up and delivering automobiles to be serviced is engaged in driving an automobile to his employer's premises or from there to its owner's premises, he is employed and engaged in the automobile business as such is defined in the policy.
Accordingly we hold the exclusionary clause contained in the Hartford policy to be applicable and affirm the trial judge in his conclusion that the policy affords no coverage in this case. We therefore need not consider the points raised by Hartford's appeal and we turn now to the issue of quantum.
Plaintiff testified that the impact of the collision twisted or jerked his neck producing a peculiar sensation therein, but one which he could not really call pain until later in the day. Around two or three o'clock that afternoon his neck had become increasingly sore and painful and he therefore consulted Dr. Edward R. Villemez, a general surgeon.
Dr. Villemez testified that he examined plaintiff, took x-rays which were negative, and diagnosed his ailment as a cervical strain. He prescribed heat and muscle relaxants. He examined plaintiff again on September 9, 1969 and on November 24, 1969, reaching the same diagnosis and prescribing the same treatment, except that on the latter occasion he recommended cervical traction. If the traction did not afford him relief, said Dr. Villemez, it would indicate the presence of a condition more serious than a cervical strain, and an orthopedic consultation would be warranted.
On January 8, 1970, plaintiff was evaluated by an orthopedic specialist, Dr. C. W. Lowrey, who found diminution in the disc space at the C-5, 6 level with posterior lipping. He also found tenderness and tightness in the neck as well as atypical sensitivity in the right arm and hand corresponding roughly to the C-6 sensory pattern. Dr. Lowrey considered plaintiff to be suffering from a cervical strain with cervical radiculitis and degenerative disc disease and arthritis at the C-5, 6 level. He stated that plaintiff was still demonstrating some residual findings and possibly radicular symptoms as a result of the accident and pre-existing degenerative changes. Being of the opinion that traction treatments *698 would be beneficial, he referred plaintiff to one Jeff Hunt, a physical therapist.
Dr. Lowrey saw plaintiff again on February 17 and March 31, 1970. The plaintiff seemed to be much improved as a result of the traction treatments and the doctor felt that it was no longer necessary that plaintiff return to see him. It was his opinion that the accident had aggravated a preexisting condition. He advised plaintiff that if the symptoms should recur it would be well to consult a neurosurgeon and with that, discharged him.
Finally, Dr. Lowrey re-examined plaintiff at his attorney's request on January 5, 1971, after he had consulted two neurosurgeons. On that occasion he found plaintiff possibly feeling somewhat better but still having considerable difficulty. He still had decreased sensation in his arm, forearm, and hand, and his neck motion was slightly more limited than on previous examinations. He told plaintiff that he concurred in the diagnosis made by the neurosurgeons.
The neurosurgeons that he referred to were Dr. Loyd C. Megison, Jr., to whom Dr. Lowrey referred plaintiff in May, 1970, and Dr. John D. Jackson, who examined plaintiff on July 8, 1970 at defendants' request. Both neurosurgeons diagnosed plaintiff's trouble as being a C-6 nerve root compression probably caused by a ruptured disc at the C-5, C-6 level. Both recommended that a myelogram be performed and, if warranted, a surgical procedure referred to as an anterior fusion. The result of such an operation was said to normally be approximately 15% disability, but in plaintiff's case, it could be greater because both neurosurgeons suspected that the pressure on the C-6 nerve root had already produced some degree of permanent damage.
Plaintiff himself testified that he has had pain in varying degrees of severity continuously since the accident and that he has frequently been forced to stop working because of it. He stated that his occupation as a draftsman requires constant turning of his head, an activity made extremely difficult by the pain in his neck. Besides the rest periods he often takes, he testified to having missed eight or nine work days because of this pain.
He admitted to having had a previous episode of pain in his shoulder and arm, that his physician had diagnosed as bursitis, some months before the accident, but specifically denied ever having experienced pain in his neck before the accident of August 22, 1969. Additionally he said that all symptoms of that previous difficulty had disappeared before the date of the accident. This was corroborated by the testimony of Herbert B. Day, plaintiff's boss, and Sidney L. Bertheaud, a co-employee. Both of these men had considered plaintiff to be in good health and free from physical problems before the accident, and both noted evidence of physical difficulty in him after the accident. Mr. Day additionally confirmed plaintiff's absences and periods of inability to do the work.
With regard to the proposed operation plaintiff stated that he was afraid and reluctant to have it. This was in accord with the testimony of the various medical specialists, all of whom testified that plaintiff was emphatic in his refusal to submit to the surgical procedure.
The award made by the trial court was said, in the able district judge's reasons for judgment, to be composed of the sums of $338.43 for loss of wages, $242.72 for medical expenses, and $25,000.00 for general damages. The defendants-appellants urge vigorously that the last item is grossly excessive.
They argue that what plaintiff suffered in the collision was at most an aggravation of a pre-existing condition, but neglect that principle of our tort law, too well known to require citation, that a tort *699 feasor takes his victim as he finds him. We think the evidence is clearly convincing that plaintiff has suffered pain and disability since the accident which was unknown to him previously.
Defendants cite a number of cases in which lesser awards were made to plaintiffs suffering from similar maladies but we are not thereby persuaded to reduce the award, as we do not consider it to be abusive of the much discretion afforded the trial court in determining the quantum of damages by La.C.C. Art. 1934(3). Matthews v. F. Miller & Sons, Inc., La.App., 146 So.2d 522 (certiorari denied, January 14, 1963.)
We were recently reminded of the extent of that discretion by our Supreme Court in Miller v. Thomas, 258 La. 285, 246 So.2d 16. After quoting from a number of previous cases on the subject, that opinion stated the rule of appellate review of quantum of damages to be as follows:
From these decisions, two principles emerge: (1) To modify the amount of an award for general damages, an appellate court must find that the trial judge or jury has abused the `much discretion' accorded by the codal provision; (2) The awards in other cases serve only as an aid in determining whether there has been an abuse of discretion and rivet no steel frame of uniformity."
We are unable to say that the award presented for review, while it appears to approach the upper limits thereof, was abusive of the trial court's discretion. On the other hand, we consider plaintiff's contention that it is inadequate to be without merit.
For the above and foregoing reasons the judgment of the district court is affirmed at the costs, both in this and in the trial court, of those defendants thereby cast.
Affirmed.